Vilis Martins LAPENIEKS, Appellant,

v.

**IMMIGRATION AND NATURALIZA-
TION SERVICE, Department of
Justice, etc., Appellee.**

No. 21199.

United States Court of Appeals
Ninth Circuit.

Jan. 11, 1968.

Duniway, Circuit Judge, dissented.

Edgar F. Gross (argued), of Gross & Eisenstein and Richard B. Cutler, Los Angeles, Cal., for appellant.

James R. Dooley, Asst. U. S. Atty., (argued), William H. Karp, General Atty., William M. Bryne, Jr., U. S. Atty., Los Angeles, Cal., Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief of Civil Division, Los Angeles, Cal., Joseph Sureck, Regional Counsel, San Pedro, Cal., for appellee.

Before CHAMBERS and DUNIWAY, Circuit Judges, and BEEKS, District Judge.

BEEKS, District Judge.

This appeal is from an order of the District Court denying a petition for naturalization filed pursuant to 8 U.S.C. § 1427. The trial court denied the petition on the ground that in 1952 the appellant had availed himself of an exemption from military service, as a Latvian national residing in the United States, where one of the conditions of claiming said exemption was permanent ineligibility for citizenship. In 1956, a change in Selective Service regulations eliminated the exemption, and appellant was reclassified I–A. He never served in the military, however, because he did not pass the physical examination administered in 1957. The question thus presented is whether the permanent bar to citizenship which appellant voluntarily accepted by claiming the exemption in 1952 was lifted when the exemption was terminated in 1957. The trial court held that the bar was not lifted, and we affirm.

Appellant immigrated into the United States from Latvia in 1952, at the height

of the Korean conflict. At that time, appellant was entitled, upon application, under the Selective Service Regulations then in effect (16 Fed.Reg. 9852) (revoked Feb. 17, 1956) and under a treaty with Latvia, to military exemption through a IV–C classification. But any alien who made application for such an exemption was thereafter, "debarred from becoming a citizen of the United States * * *.", as provided in Section 4(a) of the Selective Service Act of 1948, 50 U.S.C.App. Sec. 454(a).

After appellant registered for the draft in August of 1952, he was initially classified I–A, and apparently was ordered to report for a pre-induction physical examination on November 17, 1952.[1] The trial court found great significance, as do we, in the fact that this nation was then engaged in a brutal struggle in Korea, where American armed forces were sustaining heavy casualties.[2] In November of 1952 appellant wrote his draft board, reciting that he was a "citizen of the Latvian Republic", and requesting that, " * * * I, as a citizen of Latvia should not be drafted for a time, but classified under IV–C group. * * * I ask you kindly to consider the above mentioned and if possible revise your decision and *delay my being drafted at this time*." (petitioner's exhibit B) (emphasis added). His draft board responded promptly, reclassifying him IV–C and cancelling the order that he report for a pre-induction physical examination. Appellant testified in the district court that during his correspondence with the draft board and with the Immigration Service in October and November of 1952, he was advised that if he exercised his rights under the treaty to claim a IV–C classification that he would forever lose his rights to United States citizenship.

Effective December 24, 1952, Congress overhauled the immigration and naturalization laws with the passage of the Immigration and Nationality Act of 1952 (8 U.S.C. § 1101 et seq.) The provision thereof relevant to this case is Sec. 315(a) of that Act (8 U.S.C. § 1426(a)):

> Notwithstanding the provisions of section 405(b) of this Act, any alien who applies or has applied for exemption or discharge from training or service in the Armed Forces or in the National Security Training Corps of the United States on the ground that he is an alien, and is or was relieved or discharged from such training or service on such ground, shall be permanently ineligible to become a citizen of the United States.

In June of 1953, appellant's board sent him a letter quoting the relevant language from Section 315, and informing him, "We are advising you of the above provisions of the law in order that you may place in your file conclusive evidence as to whether or not you personally desire exemption from military service in the armed forces of the United States *since such exemption will permanently bar you from becoming a citizen of the United States*." (emphasis added.) Appellant signed at the bottom of the letter in the space provided beneath the following words: "Having full knowledge of the above facts, I wish to be exempt from military service in the armed forces of the United States," and returned the letter to his draft board.[3]

---

1. The order to report for a physical examination does not appear of record; but we conclude that there was such an order from petitioner's exhibit C, the letter from his draft board cancelling the order.

2. "Of the manifold problems confronting me early in 1953 none required more urgent attention than the war in Korea. By election time in 1952 American casualties had reached a total of 21,000 killed, 91,000 wounded, and 13,000 missing, making this the fourth most costly conflict in United States history, ranking only behind the Civil War and the two world wars." Eisenhower, Dwight D., Mandate for Change, (Garden City, N.Y., 1963), p. 171.

3. Although the reason for sending this letter does not appear of record, the court in In re Naturalization of Healy, 183 F.Supp. 651, 652 (N.D.Cal.1960) re-

The Korean truce was signed on July 27, 1953.[4]

The President of the United States, by Executive Order in February of 1956, withdrew the right of permanent resident aliens to claim exemption under international treaties. Exec. Order No. 10659, 21 Fed.Reg. 1079, 1082 (1956). In short order, appellant's local board re-classified him I–A. But appellant was found unfit at his pre-induction physical in 1957. He was classified IV–F, and has never served in the armed forces of this country. This petition for naturalization was filed in 1963.

Appellant and the Government agree that the provisions of the Immigration and Nationality Act of 1952, and more specifically Section 315(a) thereof (8 U.S.C. Sec. 1426(a)) which is quoted above, govern this case, and not the provisions of Sec. 4(a) of the Selective Service Act of 1948 (50 U.S.C. App. § 454 (a)).[5] As appellant correctly points out, the Supreme Court in Ceballos v. Shaughnessy, 352 U.S. 599, 77 S.Ct. 545, 1 L.Ed.2d 583, held that "Section 315 of the 1952 Act enacts a two-pronged requirement for the determination of permanent ineligibility for citizenship: the alien must be one 'who applies or has applied for exemption,' and also one who 'is or was relieved or discharged from such training or service on such ground.'" 352 U.S. at 606, 77 S.Ct. at 549. There can be no question in this case that appellant applied for exemption from military service on the ground he was an alien, and that such an exemption removed him from consideration for the draft for almost four years. The only question presented on these facts is whether appellant was effectively "relieved" from military service, within the meaning of Section 315(a), where the exemption was revoked in 1956.

The statute here in question has been construed by the Courts of Appeal of several circuits, as well as by several District Courts in cases presenting slightly differing factual situations. The case which is perhaps closest to this one on its facts is In re Naturalization of Cuozzo, 235 F.2d 184 (3d Cir. 1956). Cuozzo, a citizen of Italy, applied for and was granted in 1950 a IV–C classification, acknowledging in his application that, " * * * I understand that I will forever lose my right to become a citizen of the United States * * *." 235 F.2d at 185. When the exemption for resident aliens was subsequently withdrawn, Cuozzo was reclassified I–A. Cuozzo never served, however, because he was found not acceptable at his physical examination and classified IV–F. The Third Circuit held that he was not entitled to citizenship under the clear language of Section 315(a).

The Courts have favored a different rule, however, where following the reclassification the alien is inducted into the armed services. See United States v. Hoellger, 273 F.2d 760 (2d Cir. 1960); Cannon v. United States, 288 F.2d 269 (2d Cir. 1961); In re Rego's Petition, 289 F.2d 174 (3d Cir. 1961); and United States v. Lacher, 299 F.2d 919 (9th Cir. 1962). It is these cases upon which appellant primarily relies.

It should be noted at the outset, however, that the rule announced by the courts in those cases is by no means

cites that beginning April of 1953 the National Headquarters of the Selective Service System instructed Local Boards that every alien who wished to be classified IV–C under a treaty should be required to acknowledge in writing that he requests such a classification with full knowledge of the provisions of Section 315 of the Immigration and Nationality Act of 1952.

4. 15 Cong.Rec. 10232 (1953).

5. This conclusion is not at all certain; see the detailed consideration of this problem of statutory construction in United States v. Hoellger, 273 F.2d 760, 763, n. 3 (2d Cir. 1960). The trial court reached a contrary conclusion, but was of the view that the result here would be the same under either statute. Inasmuch as we concur with the latter conclusion, we accept *arguendo* the stipulation between the appellant and the Government that Section 315 should govern.

unanimous. The Court in *Cuozzo*, supra, offered the following dictum:

> If, as has been suggested, administrative practice has been to refrain from insisting upon denial of citizenship to those aliens who do in fact serve their turn in the armed forces, that administrative practice cannot alter the explicit direction of the statute. (235 F.2d at 185.)

A district court in this circuit denied citizenship to an alien who had claimed the exemption, despite the fact that he had subsequently served in the military, in In re Cerati, 160 F.Supp. 531 (N.D. Cal.1957). And Judge Friendly, dissenting in *Cannon*, supra, suggests that even temporary relief from military service is sufficient to establish a permanent bar to citizenship under Section 315(a), (288 F.2d at 272).

It is appellant's position that the exception carved into Section 315(a) by *Hoellger* and the cases following it for aliens who claim the exemption but later serve in the armed forces should not be denied one who is rejected from service because of physical unfitness. No case has been brought to our attention which so holds; nor is there any language in the statute to support such an extension of the exception. *Cuozzo* constitutes direct authority for the Government's position here; and even the majority opinion in *Hoellger* itself, the birthplace of the exception, suggests that citizenship should be denied where the alien is found physically unfit after the subsequent reclassification. 273 F.2d at 762, n. 2. By availing himself of the alien's exemption from the draft during the years 1952 through 1956, appellant avoided service of this country during the Korean conflict, and avoided the risks of personal sacrifice which were taken by citizens of this country of the same age. Under these circumstances, we must conclude that appellant was effectively "relieved" from military service, within the meaning of Sec. 315(a).

Appellant argues that the alien's exemption cannot be said to have relieved him from service, because he might have been found unfit at a physical examination in 1952, as he was in 1957. By the same token, the physical condition which provided appellant permanent relief from the draft may have arisen during the five years between 1952 and 1957. Had such been the case, it would be clear that the alien's exemption afforded appellant permanent relief from military service. It is possible that appellant's speculation and surmise as to what might have happened in 1952 if he had complied with the order to report for a physical examination is accurate. But no one will ever know, because appellant declined to take the necessary gamble. He preferred to avail himself of the sure route to relief from military service: the alien's exemption. Having done so, appellant must live with the legal consequences of his decision.

Affirmed.

DUNIWAY, Circuit Judge (dissenting):

I dissent.

In my opinion, petitioner was not effectively "relieved * * * from such [military] training or service on such ground," i. e., "on the ground that he is an alien." (Section 315(a) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1426(a)). I think that the rationale of our decision in United States v. Lacher, 1962, 299 F.2d 919, leads to this result. In that case, we expressly relied on the decisions in In re Rego's Petition, 3 Cir., 1961, 289 F.2d 174, Cannon v. United States, 2 Cir., 1961, 288 F.2d 269, and United States v. Hoellger, 2 Cir., 1960, 273 F.2d 760.

In *Hoellger*, the alien applied for and obtained a IV–C classification (alien exemption). He was first so classified on the board's initiative, on September 11, 1952. He applied for a continuance of that classification in May, 1953. He continued to be classified IV–C until February 9, 1955, when he was reclassified I–A. He was inducted on April 6, 1957. In *Rego*, the alien applied for IV–C classification on June 29, 1951 and was so classified on October 16, 1951.

Like Hoellger, he later asked to be continued in that classification, and this was done. He was reclassified I–A on April 24, 1956, and was inducted on June 5, 1956. In *Lacher*, the alien was classified IV–C on March 3, 1954. He was classified I–A on October 5, 1954 and was inducted on May 28, 1956. *Cannon* is a little different. There, the alien was classified IV–C on September 11, 1952. On May 21, 1953, he applied for a continuance of this classification. He remained IV–C until November 8, 1954, when he asked that his application for exemption be withdrawn. He was reclassified to I–A on the next day and was drafted November 10, 1956 and inducted November 30, 1956. As is noted in the majority opinion in the present case, the Korean conflict ended on July 27, 1953. Thus, as in this case, Hoellger, Rego and Cannon each obtained exemption as an alien during that conflict and the reclassification and induction of each occurred long after the end of that conflict. Yet in each case the alien was held eligible for citizenship.

The statute itself makes no distinction between an alien who is relieved from military service on the ground that he is an alien during a time when this country is at war or engaged in a quasi-war or "police action," and one who is so relieved while this country is at peace. Thus, both the statute and the cases cited above show that the existence of the Korean conflict is legally immaterial. I respectfully suggest that my brethren have allowed a perfectly natural emotional reaction to Lapeniek's performance to affect their legal judgment.[1]

There then remains but one question: does the fact that Lapenieks, after being classified I–A and summoned to service, was not inducted because he was found physically unfit, while Lacher, Hoellger, Rego and Cannon were found fit and served, make a legal difference? I conclude that it does not. In all five cases, when the alien's exemption was terminated, he ceased to be relieved from training or service in the Armed Forces "on such ground," that is, "on the ground that he is an alien." (Section 315(a), supra.) The relief then ceased to be "effective" in Lapeniek's case, just as it did in the other four cases. The decision not to induct him, not to require him to serve, was not "on the ground that he is an alien." It was on a ground applicable to all registrants, citizens and aliens alike, a ground not selected or selectable by the registrant, but one created by the government because it does not want the service of those whom it finds to be physically unfit according to a standard that it defines and applies. Surely, if Lapenieks had never been classified IV–C but had been classified IV–F throughout, he would be eligible for citizenship. It may be easier for judges who have firm convictions about the duty to serve to accept the idea of granting citzenship to an alien who actually serves after the government terminates his exemption than to accept the idea of granting it to Lapenieks, who did not serve because he turned out to be physically unfit.[2] But his relief from service on the ground that he was an alien was just as completely terminated when he was reclassified I–A as was the relief granted to Lacher, Rego, Cannon and Hoellger "on such ground" when each of them was thus reclassified. The relief later granted to, or thrust upon, Lapenieks as IV–F was not "on the ground that he [was] an alien."

---

1. I suggest, too, that the decision of this court in *Lacher* requires that we follow the rationale of *Hoellger, Rego* and *Cannon,* on which we expressly relied. Thus, the fact that the court in In re Naturalization of Cuozzo, 3 Cir., 1956, 235 F.2d 184, may have had doubts about that rationale, the fact that Judge Goodman reached a result contrary to our *Lacher* holding in In re Cerati, N.D.Cal., 1957, 160 F.Supp. 531, and the fact that Judge Friendly dissented in *Cannon* are immaterial. We are bound by *Lacher*.

2. This, I think, is the explanation for the dictum in *Hoellger*, 273 F.2d 762, n. 2. I note that a portion of that dictum, referring to an alien who voluntarily subjects himself to service after having been classified IV–C, was not followed in *Cannon*.

348

My view is strengthened by the statement by this court in *Mangaoang v. Boyd*, 1953, 205 F.2d 553, 556, cert. denied, 346 U.S. 876, 74 S.Ct. 129, 98 L. Ed. 384, that a rule of strict construction should be applied to such statutes as the one before us. That rule was applied to this statute in *Rego*.

I would reverse.