Diego Ricardo ITZCOVITZ, a permanent resident alien residing in New York, New York, Plaintiff,

v.

SELECTIVE SERVICE LOCAL BOARD NUMBER 6, NEW YORK, New York; Colonel Paul Akst, Director of the New York City Headquarters of the Selective Service System; Colonel William H. Boughton, Director of the New York State Headquarters of the Selective Service System; and P. A. Esperdy, New York District Director of the Immigration and Naturalization Service, Defendants.

No. 68 Civ. 4312.

United States District Court
S. D. New York.
May 7, 1969.

---

New York Civil Liberties Union, for plaintiff; Burt Neuborne, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, for the United States; Daniel Riesel, Special Asst. U. S. Atty., of counsel.

Daniel O. Omer, Deputy Director and Gen. Counsel, Selective Service System, amicus curiae on behalf of the Director of Selective Service; Roy R. Bartlett, Washington, D. C., of counsel.

## OPINION

HERLANDS, District Judge:

By this motion, plaintiff seeks to enjoin *pendente lite* two federal agencies: the Selective Service System and the Immigration and Naturalization Service of the Department of Justice.

With respect to the Selective Service System, plaintiff asks this Court to declare his outstanding induction order invalid and to direct that he be reclassified as an alien exempt from compulsory military service pursuant to a treaty between the United States and Argentina. The branch of the motion is granted in part.

With respect to the Immigration and Naturalization Service, plaintiff requests the Court to restrain that agency from impeding plaintiff's return to the United States and to order it to permit him to resume his permanent residence in this country. This branch of the motion is denied.

The facts relevant to the issues posed by this motion are recited in this opinion.

Except as otherwise expressly indicated, the facts are essentially undisputed.

Plaintiff is an Argentine citizen, born in 1943. He served one year in the Argentine armed forces and received an honorable discharge.

On March 27, 1966, with his parents and sister, he was admitted to the United States on a permanent resident immigration visa.

As required, plaintiff registered with Local Board No. 6 of the Selective Service System, located in Manhattan, on September 27, 1966. He was classified 1–A by Local Board No. 6, on October 20, 1966; he received such notice on October 24, 1966; and he took no appeal from such classification. Plaintiff reported for a physical examination, was found acceptable for military service on December 6, 1966, and completed, on January 24, 1967, a questionnaire which did not reflect any disability or any ground for exemption or disability other than the one which is involved in this suit.

On March 29, 1967, plaintiff received an order to report for induction into the United States armed forces on April 12, 1967. This order had been issued and mailed by Local Board No. 6 on March 27, 1967.

On the day plaintiff received his induction notice, he communicated with the Argentine Consul General in New York, Senor Carlos de Posada, and requested information about his military obligation to the United States. Senor de Posada informed plaintiff that an existing treaty between Argentina and the United States exempted plaintiff, as an Argentine citizen, from any military service in the United States armed forces.[1] Senor de Posado stated he would obtain, prior to the date set for plaintiff's induction, exemption papers for plaintiff to complete.

In April, 1967, uncertainty surrounded the legal right of a treaty alien to an

---

1. Senor de Posada was referring to Article X of the Treaty of Friendship, Commerce, and Navigation with Argentina, dated July 27, 1853, 10 Stat. 1005, T.S. No. 4, which grants an exemption from compulsory military service to citizens of Argentina residing in the United States.

exemption from military service. As a factual matter, however, at that period, Selective Service did follow a procedure whereby a resident treaty alien could elect not to serve in the United States armed forces.[2] Thus, in accordance with

2. A summary analysis of the relevant statutes and regulations, and a brief description of the administrative procedures that had been employed in dealing with treaty aliens who sought to avoid military service, may promote an understanding of the confused legal status of —and possibility of obtaining—the exemption right in April, 1967.

Sections 4(a) and 4(b) of the Selective Service Act of 1948, C. 625, 62 Stat. 604, 605–606, made all male aliens liable for registration and military service. These provisions specifically permitted any alien, not otherwise exempt or deferrable, to request exemption in accordance with procedures to be prescribed by the President, with the consequence, however, that all aliens who sought exemptions were thereafter barred from citizenship. Section 6(a) of the statute permitted the President to exempt (without the need for application) from the registration and service obligations imposed by §§ 4(a) and 4(b), all resident aliens who had not declared their intention of becoming citizens. The President issued an Executive Order exempting all treaty aliens from military service *without* requiring them individually to file an application. Exec. Order No. 9,992, 13 Fed.Reg. 5033, 5035 (1948). Consequently, treaty aliens were not considered barred from citizenship by force of their exemption. 1 Gordon & Rosenfeld, Immigration Law and Procedure § 2.49a (Rev.ed.1967).

In 1951, Congress amended the Selective Service law and qualified the President's authority to exempt (under § 6(a)) by providing that "* * * aliens admitted for permanent residence in the United States shall not be so exempted." 50 U.S.C.App. § 456(a) (1964). Congress also eliminated the right of resident aliens to request exemption (§ 4(a)) at the cost of ineligibility for citizenship.

Nevertheless, the President issued a new Executive Order, on September 25, 1951, soon after the 1951 amendments, which prescribed exemption for treaty aliens, without the need for individual application. Exec.Order No. 10,292, 16 Fed.Reg. 9843, 9852 (1951).

Notwithstanding this Presidential action, Selective Service adopted the position that the 1951 amendments eliminated any treaty right to exemptions. The Director did not, however, instruct the issuance of induction notices for treaty aliens.

Shortly after section 315 of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1426 (1964), was enacted (a provision which made any alien who applied for and received an exemption from military service ineligible for citizenship), Selective Service began requiring treaty aliens to apply for exemption (by means of SSS Form No. 130) and to acknowledge specifically in the application that the alien understood he was thereafter debarred from citizenship.

In 1956, another Executive Order rescinded the exemption granted to treaty aliens by the 1951 Executive Order. Exec.Order No. 10,659, 21 Fed.Reg. 1079, 1082 (1956). This was largely a consequence of the then view of the Justice Department (receiving mixed responses by the courts) that the 1951 amendments did, indeed, abrogate treaty aliens exemption right. Apparently, Selective Service then began issuing induction notices and refusing to accept applications for exemptions. *See* Lapenieks v. I. N. S., 389 F.2d 343 (9th Cir. 1968).

In 1963, the Department of Justice reversed its position and asked the Supreme Court to deny a petition for writ of certiorari in a case where the court of appeals had held that the 1951 amendments did not affect a treaty alien's right to exemption. *See* Brief in Opposition to Petition for Certiorari, Ungo v. Beechie, 311 F.2d 905 (9th Cir.), cert. denied, 373 U.S. 911, 83 S.Ct. 1301, 10 L.Ed.2d 413 (1963) at 7–10. No new regulations or instructions were issued by either the President or Selective Service.

Throughout this period (1951–1963) the Department of State had maintained a consistent view that the exemption right still existed under the various treaties and that, consequently, the United States was obligated, under international law, to exempt treaty aliens from compulsory military service. Towards this end the Department of State sponsored two bills to clarify the right of treaty aliens to be exempt from military service: H.R. 12036, 87th Cong., 2d Sess. (1962); H.R. 6440, 88th Cong., 1st Sess. (1963). No action was taken by Congress on either.

Contrariwise, Selective Service had maintained a consistent position that the

recognized procedure, the Argentine Consul General communicated with the Argentine Embassy in Washington, D. C. about Itzcovitz's desire to be exempted. The Embassy, on or before April 7, 1967, made a request of the Department of State for the exemption forms.

Mr. H. Rowan Gaither, an attorney in the Office of the Legal Advisor to the State Department, called the office of the Deputy Director of the Selective Service System, on April 7, 1967 and requested that office to forward the necessary forms to Local Board No. 6 for plaintiff to complete.

In his affidavit sworn to December 20, 1968, Gaither states that, after his call of April 7, 1967, he was uncertain whether Selective Service would forward the forms they administratively required of aliens seeking to avoid military service, in view of their internal administrative policy of not transmitting these forms unless they could reach the local board, through state headquarters, by regular mail. Nor, Gaither states, was he certain, if Selective Service did transmit the forms, whether they would arrive at the local board prior to the date set for plaintiff's induction.

As a result of this uncertainty, Gaither called the Argentine Embassy on April 10, 1967, and told someone of the possible difficulty in securing an exemption for plaintiff. He suggested that the Embassy contact Itzcovitz and advise him to.

check with Local Board No. 6 on April 11, to see whether the forms had arrived. Gaither states that he also suggested that Itzcovitz be told that, if the forms did not arrive, he was required to report for induction, and, in that event, Gaither would make arrangements to have plaintiff separated from the military.

Gaither alleges that the Argentine Embassy was fully aware that Selective Service required that exemption from military service be claimed prior to the induction date, and that, if the treaty alien did not "communicate" his desire for exemption prior to the induction date, the individual was obliged to report for induction and that the Department of State would, at that time, intercede and obtain his separation directly from the Department of Defense.

On April 11, 1967, in response to inquiries made by counsel plaintiff had retained for this purpose, the State Department stated that they would communicate with plaintiff's counsel and inform him whether plaintiff would have to report for induction.

On the morning of April 12th, exemption papers had not as yet been received by Local Board No. 6 for plaintiff to complete. Nor did Itzcovitz report to the induction center, as ordered. Mr. Fred Smith, a State Department officer, spoke to plaintiff's counsel and informed him that plaintiff's local board was being advised that they should not report plain-

---

exemption right had been abrogated by the 1951 amendments, but, as noted above, it had accepted applications for exemption during the years when the Executive Order, granting exemptions, was in force. Selective Service did not oppose the State Department's proposed legislation, and at the State Department's request, while the bills seeking legislative clarification were pending, Selective Service adopted the procedure that "[i]f a treaty alien who was under an order to report for induction would request exemption prior to the day set for his induction because of his alien status, the Director would cancel his induction order and postpone the issuance of another order until further notice." Brief of Director of Selective Service as *Amicus*

*Curiae* at 10. This policy was an internal unpublished one; and it did not indicate that the Director recognized any legal right of exemption for permanent resident treaty aliens.

Apparently, Selective Service still issued induction orders to treaty aliens, but would forward SSS Form No. 130 to the local board issuing the order for the alien to complete, through the State headquarters, by regular mail. If the forms were not completed before the date the alien was required to report for induction Selective Service would not cancel the order; and, if the alien failed to report, he would be classified as a delinquent. The process just described appears to have been in effect throughout 1967.

tiff as a delinquent, and that the State Department was giving due consideration to plaintiff's claim of exemption. On the same day, Mr. Gomez of the Argentine Embassy informed the local board that plaintiff had not reported for induction, but that plaintiff was requesting, through the Argentine Embassy, to be exempted from service.

Gaither was also informed that plaintiff did not report for induction. He too telephoned Local Board No. 6 on April 12th, asked it not to classify plaintiff as a delinquent, stating that he believed the difficulties relating to plaintiff's status were a result of a problem not of plaintiff's making and that, with plaintiff's co-operation, these difficulties would be resolved.[3]

Apparently before he called the local board, Gaither also spoke to plaintiff that day. He states that, at that time, he explained to Itzcovitz that he planned to arrange for plaintiff to consent to induction, and that discharge would follow shortly.

Thereafter, Gaither arranged with Local Board No. 6 to have plaintiff report for induction on May 12, 1967. Apparently, before making final the discharge ar-

rangements through the Defense Department, Gaither contacted the Argentine Embassy and informed it of the new induction date and of his plans for facilitating separation. The Embassy indicated that it would pass along this information to Itzcovitz; and Gaither alleges that he also advised plaintiff of the new arrangements.

Plaintiff, through his counsel, alleges, however, that the instructions he received were to report to the induction center on May 12, 1967, and there to execute the exemption papers.

On May 12, 1967, plaintiff and his father went to the Argentine Consulate in New York to learn whether the exemption papers had arrived. Consuls Sagasta and Street advised plaintiff and his father to report to the induction center "where they would give [plaintiff] an extension until the papers arrived from Washington." Certified English Translation of Affidavit of Senor Itzcovitz [plaintiff's father], sworn to January 14, 1969, at 1.

Plaintiff and his father then proceeded to the induction center. Plaintiff apparently informed a Captain Schmidt that he had come to request an exemption

3. What the precise nature of the difficulties were has not been articulated by either Gaither or the Government. But it would seem fair to assume that they relate to the failure of plaintiff to execute SSS Form No. 130 prior to April 12, 1967. Apparently, the administrative accommodation that Selective Service reached with the Department of State described in note 2, *supra*, only provided for cancellation of the induction order when the forms were completed prior to the date set for induction, regardless of the reason for the failure to complete the form. If this was not accomplished, Selective Service would not cancel the induction order or permit the alien to file the exemption form after the date set for his induction. It would cooperate only to the extent of not forwarding the treaty alien's name to the United States Attorney for prosecution as a delinquent.

It is not clear whether plaintiff was at fault in not having completed the exemption form by April 12, 1967. The papers submitted to the Court do not

disclose whether treaty aliens were expected to apply for exemption papers prior to the time they received an induction order, or, indeed, if they were permitted to request exemption prior to such time. Moreover, there is uncertainty whether the forms ever arrived at Local Board No. 6 even after April 12, 1967. According to the brief of the Director of Selective Service as *Amicus Curiae*, Selective Service (not necessarily the local board) was first informed of plaintiff's request in a telephone call on April 12, 1967. Selective Service (presumably, national headquarters) did receive a written note from the Department of State on April 13, 1967, which was delayed in arriving due to its having been sent to the wrong agency. This contradicts Gaither's statement that he called Selective Service on April 7, 1967; and it would indicate that the exemption forms were never sent. Selective Service does not, however, explain why these forms were not available at each local board, or even at state headquarters.

from military service as an Argentine citizen. Captain Schmidt referred plaintiff to Godofredo Le Bron, the Selective Service liaison officer stationed at the induction center.

Le Bron talked to plaintiff and Senor Itzcovitz in his office. While the substance of the conversation is not disputed, the evidence concerning the manner and exact phraseology (which are important) is in sharp conflict. Plaintiff informed Le Bron that he was an Argentine citizen and that his Embassy and the State Department were attempting to have him exempted from military service. Not having any information regarding plaintiff, Le Bron called Local Board No. 6 and was advised that plaintiff was supposed to have reported for induction on April 12, 1967.

Plaintiff claims that Le Bron told him that he was subject to an outstanding order of induction and was a delinquent.

Plaintiff's father alleges that Le Bron spoke to plaintiff in "a tough, arrogant and disrespectful manner * * *" and "* * * in a violent manner * * *". He states that "* * * Lebron's [sic] tone was a little threatening * * *." Affidavit of Senor Itzcovitz at 1. Le Bron states: "* * * I never told Itzcovitz that he was a common delinquent or attempted to intimidate him in any manner." Affidavit of Godofredo Le Bron, sworn to December 19, 1968, ¶ 6. He states he suggested that plaintiff go to Local Board No. 6 and "get his situation straightened out with the local board or he might end up in a delinquent status as there was an outstanding notice of induction." ¶ 4.

Someone at the induction center called Gaither and informed him that plaintiff refused induction, claiming his rights under the treaty. Gaither recounts that he was informed that plaintiff's statement was made pursuant to advice of the Argentine Consulate in New York. Gaither Affidavit, p. 5.

Plaintiff and his father then reported to Local Board No. 6, pursuant to Le Bron's suggestion. There plaintiff

(whether on his own or at the request of Edward Martin, the Clerk of Local Board No. 6, being disputed) wrote the following:

"I wish to be exempt from military service by reason of my being an Argentine National.

* * * * * *

Diego Ricardo Itzcovitz"

On or shortly after May 12, 1967, Gaither called Itzcovitz and apologized for his inability to enable plaintiff to obtain exemption papers in time, and once again informed him that he would have to submit to induction and that thereafter he would be separated. He told plaintiff that he would arrange another date for this induction.

Selective Service records disclose that Gaither called Local Board No. 6 on May 12, 1967 and informed it that documentation regarding plaintiff "is not forthcoming." Instruction was given by Gaither that plaintiff be inducted and that Gaither would secure his discharge later. (S. S.S. Form No. 119, May 12, 1967).

Plaintiff's Selective Service records include a report of a telephone call received by Martin from plaintiff to the effect that plaintiff would report to the local board on May 15, 1967 with his attorney. On May 15, 1967 Martin received a call from a Mr. Souza, who identified himself as plaintiff's attorney. Martin explained to Souza that plaintiff was a delinquent and that the Local Board No. 6 intended to report his name to the United States Attorney.

Souza told Martin that he would advise plaintiff to report to the board. Plaintiff did not appear on May 15, 1967. There is nothing in the papers submitted which explains plaintiff's failure to appear nor, however, the purpose of or necessity for his appearance.

A May 18, 1967 entry in plaintiff's Selective Service file details a phone conversation between Mr. Gomez of the Argentine Embassy and the local board and notes that the Argentine Ambassador would meet with the Secretary of State on May 19th, regarding plaintiff.

Gomez stated that the Argentine consulate in New York advised plaintiff not to report for induction until such time as a decision was made between the Ambassador and Secretary of State. In a call to the local board, Gaither confirmed the fact of the meeting between the Ambassador and the Secretary, noting that "this case would have never reached this point but for an administrative error on the part of the State Department." (S. S.S. Form No. 119, May 18, 1967). Plaintiff's father then called, stating that plaintiff had been told by the consulate not to report for induction.

On May 19th, Martin called New York headquarters of Selective Service and informed them of the Gomez telephone message of the previous day. Mrs. Rendel of the Legal Division of New York headquarters telephoned the local board on the afternoon of May 19th. She stated that Captain Maher of the Legal Division had issued instructions that plaintiff's name was to be placed on a Form 301 (Delinquent Registrant Report) that day, if there was still time, or on the next business day.

Meanwhile, on or about May 17, 1967, Gaither communicated with plaintiff and explained that he would make arrangements for plaintiff to be inducted and to be released "within the shortest period of time and hopefully without having to leave the New York area." Gaither Affidavit, p. 6. He also informed plaintiff that the induction date would be May 23rd, and that plaintiff would have to execute a request for induction.

On May 22nd, Gaither again communicated with plaintiff and told him that a Courier would fly to New York with orders for plaintiff to be separated from the military. Gaither explained that plaintiff would have to submit to induction, but that plaintiff would, thereafter, be separated from the military within a few days. In his affidavit, Gaither states that he requested plaintiff to assure him that plaintiff would indeed submit to induction, and that he would proceed to arrange for plaintiff's discharge through the Department of Defense only upon being so assured.

Gaither then called the local board to report the result of the meeting held on May 19th. The Argentine Ambassador spoke with an Assistant Secretary of State and was informed that the State Department was "reluctant to intervene as the registrant's order to report for Induction had already been mailed to the registrant." (S.S.S. Form No. 119, May 22, 1967). Gaither also informed the local board that plaintiff had been instructed to report to the local board and that the necessary steps to effectuate his induction should be taken.

At 1:00 P.M., May 22nd, Mr. Gomez of the Argentine Embassy called to inform the local board that plaintiff was being advised to report to the board that same day for induction.

Plaintiff appeared with his father at Local Board No. 6 at 2:15 P.M. Martin announced to plaintiff that all was arranged and that he would be inducted the following morning, May 23rd, at 7:00 A.M. Plaintiff, apparently, had assumed that his induction and release were mere formalities and would be effected that same day; thus, he was surprised when told of the induction planned for May 23rd. Plaintiff claims that he protested to Martin that Gaither had promised him that a courier was due to arrive shortly from Washington with papers, and that there was thus no need for induction at all. Martin denies that plaintiff reacted in this manner.

Though the exact order and reasons for the following are unclear, it appears:

(1) Martin communicated with Le Bron and confirmed that the induction would occur at 7:00 A.M., May 23rd. Plaintiff claims that Le Bron was asked over the telephone whether plaintiff would be immediately exempted on May 23rd and whether it was not the fact that plaintiff's induction was only a formality. Le Bron allegedly responded that it would take about three or four months, at the very least, for plaintiff to be sepa-

rated. Le Bron denies ever having so indicated.

(2) Martin either suggested or requested that plaintiff execute a written statement requesting induction. Plaintiff did so and apparently copied the text written out by one of the clerical staff at the local board. Plaintiff contends that he resisted making this written statement but did so only after Martin told him that if he did not do so he would face arrest as a draft violator and that Martin showed him a form containing his name, the substance of which requested that Itzcovitz be detained as a draft delinquent. On the other hand, Martin avers that he suggested that plaintiff formalize his request for induction to complete the record; that plaintiff do so voluntarily; and that plaintiff was never threatened with jail for failure to do so, though he was informed that he would be reported on Form 301 to the United States Attorney for prosecution if he failed to report for induction.

(3) Martin then gave plaintiff a typed letter directing him to report for induction on May 23, 1967, 7:00 A.M. Selective Service records indicate that Martin received approval from Captain Maher to hand plaintiff this letter. It is not clear what else Maher told Martin in the course of this phone conversation.

Later on May 22, 1967, plaintiff telephoned Senor de Posada, the Argentine Consul in New York. He was told by Senor de Posada that the effect of his having signed the statement requesting induction was to waive his right to exemption under the treaty, and that plaintiff was now liable for full military service.

Alleging that he was confused and frightened at that time by the prospect of either serving in the armed forces for an extended period of time or facing arrest for refusing to serve—despite the treaty exempting him from military service—plaintiff left the United States for Lisbon. He used an open ticket he had purchased on April 1, 1967, on an airline employee discount basis, which was one of a group of tickets for a flight from New York to various cities in Europe and the return trip.

Gaither called the induction center on May 23, 1967 to discover whether plaintiff had reported for induction. After learning that plaintiff had not reported, Gaither called Martin and so advised him, stating that it was his belief that plaintiff was "afraid he would have to serve his complete time in the Army." (S.S.S. Form No. 119, May 23, 1967).

On May 26, 1967, Local Board No. 6 sent a Delinquent Registrant Report (S. S.S. Form No. 301) regarding plaintiff to the United States Attorney for the Southern District of New York.

The Federal Bureau of Investigation sent a report to the Immigration and Naturalization Service [hereinafter I. N.S.] stating that plaintiff was declared a delinquent for failing to report for induction. On October 19, 1967, the I.N.S. prepared a "lookout notice worksheet" which informed all I.N.S. officers on this country's borders that plaintiff may be an excludable alien.

As far as the papers and records submitted to this Court disclose, the first attempt plaintiff made to remedy the unfortunate situation in which he now finds himself was a letter dated May 6, 1968, sent by plaintiff's present attorney to defendant P. A. Esperdy, New York District Director of I.N.S. The letter briefly described why plaintiff left the country and asked whether some procedure could be arranged to permit plaintiff to return to New York and resume his permanent resident status.

Sol Marks, New York Deputy District Director, apparently contacted plaintiff's attorney, Mr. Neuborne, and advised him to arrange with the District Director at St. Albans, Vermont for an exclusion hearing before a special inquiry officer. The documentary record is in much confusion at this point. The Court is unable to discover whether Mr. Neuborne did communicate with the St. Albans District Director and what was the substance of that conversation, if any. Nor has Mr. Neuborne, in his various affi-

davits, adverted to any conversation with either Mr. Marks or the St. Albans District Director.

Plaintiff apparently attempted to fly from Montreal to New York on May 14, 1968. He saw Willard H. Pfrench, the Immigrant Inspector in charge of the I.N.S. office in Montreal, and handed him a letter which, after briefly describing plaintiff's version of the situation, requested permission to enter the United States to resume his permanent residence and resolve the complications surrounding his military service. He claims he was then refused permission to board a New York-bound flight.

Pfrench, at first, denied having ever received such a letter, but upon analyzing a notation made on a copy plaintiff's attorney has submitted to the Court, he admits that he did initial the letter. He does not know, however, how plaintiff "obtained a copy of a letter designated for internal use only." Affidavit of Willard H. Pfrench, dated January 20, 1969 at Montreal, Quebec, Canada. The usual method of acknowledging receipt of a document, Pfrench states, is to write the word "received" on the copy, initial and date the copy, or to mail stamp the letter with the date, place and name of officer receiving the original placed on the copy. Pfrench concludes that, in view of the fact that there is no formal record in plaintiff's I.N.S. folder indicating plaintiff had attempted to enter the United States from Montreal and was denied entry by an immigration inspector, plaintiff could not have had a ticket and boarding pass for an aircraft ready to depart for a United States destination, but was merely making an informal inquiry to determine whether he was admissible.

Moreover, Mr. Pfrench explains, in matters concerning draft evasion, it is I.N.S. policy to question such applicants initially on United States soil, and that these applicants are referred to Rouses Point, N. Y. from Montreal for examination. Whenever done, a record of the referral is made by the Montreal inspector and kept for one year. Pfrench states

that he has found no record at his office that plaintiff was ever refused admission or referred to Rouses Point. Pfrench Affidavit, dated December 16, 1968 at Montreal, Quebec, Canada.

On October 30, 1968, plaintiff filed his complaint in this action. Soon thereafter he noticed this motion for a preliminary injunction.

## I. RELIEF SOUGHT AGAINST SELECTIVE SERVICE

### A. Jurisdiction

Plaintiff seeks to have this Court declare his outstanding induction order invalid and to order that he be reclassified as an alien exempt from compulsory military service pursuant to treaty. Since this relief is requested against the Selective Service System, and directly against Local Board No. 6, this Court is faced with the question of the applicability of section § 1(8) (c) of the Military Selective Service Act of 1967, 81 Stat. 104, 50 U.S.C.A.App. § 460(b) (3) (1968), amending, § 10(b) (3) of the Selective Service Act, 50 U.S.C. App. § 460(b) (3) (1964), which relevantly provides:

"No judicial review shall be made of the classification or processing of any registrant by local boards, appeal boards, or the President, except as a defense to a criminal prosecution instituted under section 12 of this title, after the registrant has responded either affirmatively or negatively to an order to report for induction, * * * *Provided*, That such review shall go to the question of the jurisdiction herein reserved to local boards, appeal boards, and the President only when there is no basis in fact for the classification assigned to such registrant."

On December 16, 1968, the Supreme Court decided the case of Oestereich v. Selective Service System, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968). In that case, plaintiff was a divinity student—thus qualifying for an exemption from military service granted by section 6(g) of the 1951 Act, 50 U.S.C. App. § 456(g) (1964)—who originally had been

classified IV–D, but had been reclassified I–A by his local board because of plaintiff's failure to have his registration certificate in his possession and for failure to provide the local board with notice of his "local status." After an unsuccessful appeal within the Selective Service System, plaintiff was ordered to report for induction. He then brought suit seeking to restrain his induction.

The Supreme Court interpreted the amended § 10(b) (3) as permitting a district court to review action taken by a local board in a situation where the grant of exemption was neither an exercise of discretion nor an evaluation or determination of facts, and the board's action in depriving the registrant of his statutory exemption and ordering his induction was without any basis in law.

Plaintiff here claims that he has a recognized right to exemption from military service granted him by a treaty still in force,—an exemption right that is equivalent to one granted outright by statute. Therefore, he contends that the local board had no power to classify him I–A and order his induction. He submits, that if this be established, the restriction on jurisdiction in § 10(b) (3), as interpreted by the Supreme Court in *Oestereich, supra,* is inapplicable.

Defendants attempt to distinguish *Oestereich* by adverting to the fact that, in this case, the local board had merely followed the existing policy of refusing to cancel induction orders when a formal request for exemption had not been filed prior to the date set for induction. It is asserted that this was a reasonable policy designed to facilitate the orderly processing of registrants and to furnish a specified number of men each month for the Department of Defense. The actions taken by Local Board No. 6, it is thus argued, were not "blatantly lawless" as were the actions of the local board in

*Oestereich,* and, therefore, the conclusion there reached, that jurisdiction existed despite § 10(b) (3), is inapplicable to this case.

■ It appears to this Court that *Oestereich* holds that the district courts have jurisdiction to enjoin induction when the local board exceeded its statutory authority in revoking a statutory exemption for inappropriate reasons. That case establishes the principle that pre-induction review is available to enjoin induction whenever the local board revokes or denies a registrant an exemption granted by statute (or statutory equivalent) for reasons other than those permitted by statutory mandate, and where the revocation or denial was not dependent on any finding of fact or exercise of discretion which Congress authorized the local boards or the Selective Service System to make.[4]

■ The Court rejects defendants' argument that the local board's acts do not invoke this principle because it is apparent (as will be discussed more fully *infra*) that neither the local board nor the Selective Service System had authority to deny an exemption granted by treaty (treaties being statutory equivalents) on the basis of an asserted noncompliance with an internal policy which was never formally promulgated in the form of rule or regulation and which was unduly burdensome in application. Moreover, though the right to exemption may not have been clearly available in April, 1967,[5] Selective Service's refusal to grant such exemption to plaintiff was not based on an exercise of discretion or evaluation of any material factual evidence, but rather was based upon an administrative policy having roots in a determination of a question of law which is primarily one for courts to make. As such, review of this allegedly invalid local board action was not intended by Congress to

---

4. That this is the key to the holding in *Oestereich* is evident from footnote 7 of the Court's opinion; from Mr. Justice Harlan's concurrence (393 U.S. at 239–245, 89 S.Ct. 414) and from the opinion of the Court in the case of Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), decided the same day. See also part II of this opinion.

5. *See* note 2, *supra.*

await the filing of a writ of habeas corpus or a prosecution for failure to report for induction. Oestereich v. Selective Service System, *supra.*

### B. Does Plaintiff Have a "Plain and Unequivocal" Right to Exemption?

*Oestereich* clearly holds that the exemption must be "plain and unequivocal" in order for a district court to have jurisdiction to review and remedy the withholding of exemption. *See* 393 U.S. at 238, 89 S.Ct. 414. In this case, plaintiff's right to exemption would be "plain and unequivocal", if found to exist, because it would not depend on any exercise of discretion or disputed finding of fact: whether treaty aliens still have a right

to exemption despite the 1951 amendments [6] is a question of law, and would thus be "obvious" from the face of the complaint. Cf. Oestereich v. Selective Service System, 393 U.S. at 238, 89 S.Ct. 414, n. 7.

Plaintiff maintains that the 1951 amendments do not supersede the pre-existing treaty right.[7] The Government has joined with plaintiff on this issue.[8] While the parties have agreed on this essential question, since it is an issue of law, the Court must rule on the point independently. And being a question of law similar to treaty interpretation, it is one that is primarily for the Court to decide. Particularly relevant to the

---

6. *Id.*

7. In addition to his position that the treaty presently confers an exemption right, plaintiff (in his Proposed Findings of Fact and Conclusions of Law) has adopted an alternative approach, which would obviate the need for ruling upon the current validity of the treaty provision.

The argument can be stated as follows: In April, 1967, Selective Service was following the practice of cancelling outstanding induction orders sent to treaty aliens who requested exemption, pending legislative clarification (*see* note 2, *supra*). Plaintiff, a treaty alien, requested such exemption before the date set for induction. Selective Service, thus, could not lawfully refuse to cancel plaintiff's induction order, irrespective of whether the treaty exemption actually exists, because this would be contrary to its own administrative policy.

There is a group of cases holding that an agency or administrator, even acting in an area wherein there is complete discretion, may not ignore its own internal rules and regulations, *e.g.*, Smith v. Resor, 406 F.2d 141 (2d Cir. 1969); *see* Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1043 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Hamlin v. United States, 391 F.2d 941 (2d Cir. 1968). However, these cases involved *published* rules and regulations. Since we deal here with an unpublished policy that was informal in nature, the principle of these cases may be inapplicable.

Moreover, this theory presupposes that Selective Service's treatment of plaintiff

was a departure from the general administrative policy given effect by Selective Service. It well may be, however, that Selective Service did not, generally, cancel induction orders of those treaty aliens who had not, prior to the time set for their induction, filed a written request for exemption with their local board. Plaintiff did not so file a written request prior to April 12, 1967. Thus, if such were Selective Service's administrative practice (and the Court is unable to make any findings on this point), then it did not violate its own informal procedures in processing plaintiff, and may not have acted unlawfully in this respect.

In light of the disposition of the Selective Service aspects of the case, the Court finds it unnecessary to devote further discussion to plaintiff's alternative theory for the grant of injunctive relief.

8. On April 1, 1968, the Attorney General issued an opinion (Vol. 42 No. 28) expressing the view that the 1951 amendments did not prohibit the exemption from military service contained within treaties of the sort here involved and that the United States is in a position to honor this provision and its obligation to exempt permanent resident aliens. This opinion was issued after consideration of the views of the Legal Advisor to the State Department (that the treaty right is still operative) and of the Director of Selective Service, who took a contrary position. Presumably, the Opinion of the Attorney General is binding upon all subdivisions of the Executive branch, including Selective Service.

Court's determination, however, and entitled to great weight are the views of the Government which negotiated the treaties, which must deal with foreign governments regarding these treaties, once ratified, and which also is charged with enforcement of the Selective Service laws. *Cf.* Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961).

After noting that the courts have differed on the issue now before this Court,[9] the Opinion of the Attorney General concludes that the treaty exemption rights must be recognized because (1) Congress did not clearly express an intention to abrogate the treaty right; (2) the statute is not irreconcilable with an existing treaty right; and (3) the contemporaneous interpretation given the statute (in the form of the Executive Order promulgated soon after the passage of the 1951 amendments, Exec. Order No. 10,292, 16 Fed.Reg. 9843, 9852 (1951)) provided for exemption of *inter alia*, permanent resident treaty aliens.

■ The Court has carefully considered the statutory analysis contained in the Opinion of the Attorney General, the Brief of the Director of Selective Service as *Amicus Curiae*, the opinions of the various courts which have considered the question, and the applicable principles of statutory interpretation. This Court concludes that the treaty exemption right is still operative.

■■ It must be remembered that "[a] treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed." Cook v. United States, 288 U.S. 102, 120, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933).

This familiar rule should be strictly applied because relations with other countries are directly affected. Courts should be more hesitant to find that statutes of Congress modify or abrogate treaty provisions than to find that they repeal existing legislation because Congress was not the principal draftsman or actor in making the treaty part of the "supreme law of the land." Thus, the standard repealer clause contained in section 17(a) of the Act, 50 U.S.C. App. § 467(a) (1964), cannot be read to affect the treaty right unless the legislative history manifestly evidences such intention. The legislative history, however, makes no reference to the exemption provided by treaty; indeed, there is only a passing reference to the changes in the law respecting aliens in general.

Admittedly, section 4(a) of the law, as amended, appears to make every resident male alien liable for military service and appears to eliminate the authority of the President to exempt such resident aliens from service. But, as Judge Wyzanski in Schenkel v. Landon, 133 F.Supp. 305 (D. Mass.1955) held, such a literal interpretation should be rejected.

Though Judge Wyzanski dealt with the issue of the effect of the 1951 amendments upon presidential authority to exempt treaty aliens and was concerned with the consequent sharp curtailment of presidential discretion in a most sensitive field of foreign relations that would result from a literal construction, his reasoning seems applicable to the broader question of whether the statute should be read as repudiating the affirmative obligation of the United States, under the treaty, to exempt aliens from military service. As he emphasized, the serious diplomatic implications of such a result

---

9. *Compare* In re Rego, 289 F.2d 174 (3d Cir. 1961); United States v. Rumsa, 212 F.2d 927 (7th Cir.), cert. denied, 348 U.S. 838, 75 S.Ct. 36, 99 L.Ed. 661 (1954); United States ex rel. Rosio v. Shaughnessy, 134 F.Supp. 217 (S.D.N. Y.1954); United States v. Gredzens, 125 F.Supp. 867 (D.Minn.1954) (all holding that treaty exemption right did not survive 1951 amendments) *with* Ungo v. Beechie, 311 F.2d 905 (9th Cir.), cert. denied, 373 U.S. 911, 83 S.Ct. 1301, 10 L.Ed.2d 413 (1963) (treaty exemption right unaffected by 1951 amendments) *and* Schenkel v. Landon, 133 F.Supp. 305 (D.Mass.1955) (Exec.Order No. 10,292, 16 Fed.Reg. 9843, 9852 (1951), exempting permanent resident treaty aliens valid notwithstanding 1951 amendments).

would have been expected to cause Congress to seek a statement of the State Department's views (or at least have been expected to cause the Department to announce its position *sua sponte*).

Moreover, one would have expected the Department of State to notify foreign governments that the United States, through Congressional action, had modified, unilaterally, important and long standing treaty provisions, thus probably enabling foreign governments to subject United States citizens permanently residing abroad to compulsory military service in their armed forces. The absence of these events persuasively indicates that Congress had no intention of abrogating the treaty rights when it enacted the 1951 amendments, and that it was not so interpreted by legislative, administrative, and diplomatic personnel immediately before or after passage.

■ The most convincing factor leading to the rejection of a literal interpretation of the obviously sweeping language of section 4(a) is the immediate administrative action taken upon the passage of the 1951 amendments. As already noted, the President at that time promulgated a new set of regulations regarding exemptions, which—rather than rescinding the substance of the former regulations which granted exemption, as would be expected if it were intended that treaty aliens would thereafter be liable for military service—reconferred exemptions for treaty aliens. The lack of any Congressional reaction is supportive of the conclusion that Congress never considered the effect of the 1951 amendments on outstanding treaties and of aliens' rights thereunder, and that the amendments were, thus, not intended to apply to treaty aliens. Under these circumstances, holding the 1951 amendments to have superseded the treaty would be tantamount to repeal by implication, a result looked on with disfavor by courts. *E. g.*, Cook v. United States, 288 U.S. 102, 53 S.Ct. 305 (1933); Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907); United States v. Lee Yen Tai, 185 U.S. 213, 22 S.Ct. 629,

46 L.Ed. 878 (1902); Ungo v. Beechie, 311 F.2d 905 (9th Cir.), cert. denied, 373 U.S. 911, 83 S.Ct. 1301, 10 L.Ed.2d 413 (1963). *Cf.* McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957).

In view of the contemporaneous interpretation given by the Government, and the fact that the Government has now seen fit to grant exemptions to treaty aliens (though it is unclear to what extent Selective Service has implemented 42 O.A.G. No. 28), the Court will not overturn the treaty exemption in the absence of any Congressional statement that the treaty exemption was intended to end. The Court rules that plaintiff was and is entitled to an exemption from military service.

## C. Was the Refusal to Cancel Plaintiff's Induction Order Unlawful?

Defendants contend that, notwithstanding plaintiff's right to exemption from military service, to secure such exemption he had to submit a proper request prior to the date set for his induction. Plaintiff allegedly not having done so, it is argued that his induction order was properly left outstanding; and that the appropriate procedure for plaintiff to follow, in order to benefit from his treaty right, was for him to have submitted to induction and then permit the State Department to obtain his discharge from the Department of Defense. Defendants maintain that the Selective Service's actions were reasonable and that they did not unlawfully interfere with plaintiff's treaty rights. Plaintiff's non-compliance with this procedure, it is asserted, makes preliminary injunctive relief unwarranted.

■ The Court must reject this argument. The "accepted" procedure was not formally published or promulgated in any form. Plaintiff cannot be deemed to have waived, or be precluded from asserting, his treaty right by his failure to follow the procedure established. *Cf.*

United States v. Eisdorfer, 299 F.Supp. 975, E.D.N.Y., 67 Cr. 302, April 16, 1969, Appendix A at 11.

 Furthermore, plaintiff cannot be considered to have been tardy or disruptive of the normal process in making his request when or in the manner he did. The weight of the credible evidence establishes that the Selective Service System was made aware of plaintiff's request for exemption as soon as practicable after he was ordered to report for induction—the period March 29th—April 7th was not an unreasonably long time to notify Selective Service, in view of the circumstances that the chain of communication was from plaintiff to his consulate to the Embassy to the Department of State to Selective Service—and before April 12th, the day set for plaintiff's induction.

 The Court also concludes that the requirement that the forms be forwarded by regular mail through state headquarters and the unavailability of these forms at the local board were unreasonable under the circumstances; and non-compliance with this aspect of the process does not diminish plaintiff's right to exemption or affect the need for injunctive relief.

 Nor should plaintiff have been required to submit to a "symbolic" induction and then await discharge. This is an unduly onerous requirement to place on one asserting a treaty right, especially when it becomes necessary for reasons other than fault of the treaty alien.

Furthermore, there is the attendant possibility that, as a result of submitting to induction, plaintiff's status as an Argentine citizen might be affected. The possibility is more than speculative in this case because, after executing a statement requesting induction, reporting for induction on May 23rd, might be interpreted as voluntarily serving in the armed forces of another country.

Defendants argue that the Court should deny the motion because plaintiff's claims are premature and that there has been no showing of irreparable harm.

The basis for this argument is that plaintiff was reclassified IV–C on November 16, 1967; that upon his return to this country he will be reclassified and can present his claims at that time; and, that defendants' counsel, in an affidavit sworn to January 14, 1969, stated that the United States Attorney for the Southern District of New York has no "present intention" of prosecuting plaintiff for failing to obey the outstanding induction order, for leaving and remaining outside the United States to avoid or evade military service, or for any other possible violation of Selective Service laws.

 The Court is of the opinion, however, that plaintiff is entitled to some injunctive relief against the Selective Service System and that his application is not premature. Under 32 C.F.R. § 1622.41(c), plaintiff's local board is obligated to reclassify him upon his return to this country. Thus, while plaintiff is presently classified IV–C, this is merely a temporary classification. Defendants have not indicated, in any manner, how plaintiff's situation, practically speaking, would be different upon his return, which would present the possibility that the induction order would be cancelled, and thus justify the Court's refusal to act at this time.

Furthermore, the stipulation to the effect that there is no present intention to prosecute plaintiff cannot be said to eliminate the need for injunctive relief for the obvious reason that "present intentions" can become "past policy" merely upon a change in personnel.

In addition, consequences other than possibility of prosecution may result from failure to obey an induction order that is unlawfully outstanding.

Most notable and apposite to this case is the provision in section 212(a) (22) of the Immigration and Nationality Act of 1952, 8 U.S.C. § 1182(a) (22) (1964) defining as persons ineligible to receive visas and excludable from the United States, "persons who have departed from or who have remained outside the United States to avoid or evade training or serv-

ice in the armed forces * * *". Consequently, while the United States Attorney's statement may give some measure of relief from the threat of prosecution, plaintiff, nevertheless, may be excluded on the basis of an unlawful induction notice still outstanding.

The Court hereby orders Local Board No. 6 to cancel its outstanding induction order issued on March 27, 1967, directing plaintiff to report for induction April 12, 1967 and to refrain from issuing new induction orders.

■ The Court will not, however, at this time enjoin or order Local Board No. 6 or the Selective Service System to classify plaintiff permanently in class IV–C, or in any other class which signifies his treaty exempt status, as plaintiff requests. This is an area of administrative determination into which the Court is unwilling to intrude. Once the present induction order is cancelled and Selective Service is restrained from thereafter inducting plaintiff, as the Court has above ruled, plaintiff has secured all the relief necessary under the circumstances.

## II. RELIEF SOUGHT AGAINST I.N.S.

Plaintiff also seeks to restrain I.N.S. from impeding plaintiff's return to the United States and to obtain an order directing I.N.S. to permit him to resume his permanent residence. For the reasons which follow, the Court cannot enter an order granting such relief.

■ At the outset, the Court points out that plaintiff has not been the subpect of an "exclusion order" within the meaning of the 1952 Act. Plaintiff has never been referred to a special inquiry officer for an exclusion hearing. The only factual basis for plaintiff's claim that he has been excluded is the previously described encounter with Pfrench.

Even if plaintiff's version of the episode were completely accepted, Pfrench, being only an immigration inspector, was without authority to exclude an alien seeking entrance to this country. This authority is given only to special inquiry officers. See 8 U.S.C. §§ 1225, 1226 (1964). Thus, 8 U.S.C. § 1105a(b) and (c) restricting judicial review of final orders of exclusion to habeas corpus after exhaustion of administrative remedies, is inapplicable. Plaintiff's argument with respect to Rusk v. Cort, 369 U.S. 367, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962) and the purpose of the restrictions upon judicial review contained within those subsections is inapposite. The determination of whether the Court should grant relief at this time is governed by general judicial principles.

### A. The Doctrine of Primary Jurisdiction

What plaintiff actually seeks is a decision by this Court that when, and if, plaintiff appears at a United States border entrance, he must be admitted. The Court, however, is of the opinion that such a determination should be made initially by the I.N.S. in accordance with the procedure established by Congress and the I.N.S. as set forth in its published regulations.

This result springs from the necessary application of the doctrine of primary jurisdiction to this case. Congress has legislated an elaborate procedure for determining who shall be admitted into this country's borders from points outside. It has entrusted this function to the Immigration and Naturalization Service and, specifically, to an administrative system involving immigration inspectors, special inquiry officers, and appeals to the Attorney General (who delegated this function to a Board of Immigration Appeals. 8 C.F.R. § 236.5).[10] Congress

---

10. Sections 235 and 236 of the 1952 Immigration Act, 8 U.S.C. §§ 1225 and 1226 (1964) set forth the procedure to be followed. Section 235(a) provides that the initial inspection of all aliens seeking admission (or readmission) to the United States shall be conducted by immigration officers. They have the

power to admit but (except in a few limited situations not applicable here, § 235(c), 8 U.S.C. § 1225(c) (1964) they have no power to exclude. Any alien who does not appear to this examining immigration officer to be clearly entitled to land, shall be detained and a further inquiry is to be conducted by a special

has circumscribed the role of the courts in this process, as noted, by restricting the right of judicial review to final orders of exclusion in cases where the alien has exhausted every internal, administrative avenue. To permit, in cases such as these, resort to the courts before any administrative action has been taken—despite the unavailability of such judicial intervention once the administrative process has begun—would wreak havoc upon the orderly scheme envisioned and established by statute.

■■ The proper approach, as repeatedly expounded by the Supreme Court, is for the courts to defer to administrative expertise and await the agency's initial determination in a case raising factual and legal issues within its area of special competence. *See* Best v. Humboldt Placer Mining Co., 371 U.S. 334, 338, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963); United States v. Western Pacific Railroad Co., 352 U.S. 59, 63–65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956); Far East Conference v. United States, 342 U.S. 570, 574–575, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

Plaintiff, however, contends that the *Oestereich* rationale is dispositive of the doctrine of exhaustion of administrative remedies and permits immediate judicial review of agency action. The short answer is that, in this case, no agency has as yet acted: there is nothing for the court to review. Assuming that the same argument is advanced with respect to the doctrine of primary jurisdiction,[11] the Court concludes that the *Oestereich* rationale or principle is inapplicable to this case and that plaintiff should follow the normal administrative process.

Plaintiff's argument is that *Oestereich* holds that one may have immediate resort to the courts whenever he alleges that an administrative agency acted without authority and thus lawlessly. In his view, since a jurisdictional prerequisite to conduct any exclusion hearing is the detention of an alien who is making an "entry", if plaintiff cannot be deemed to be making such entry upon his return on account of circumstances surrounding his departure, the I.N.S. cannot class him as an excludable alien and bar his admission to this country.

Plaintiff's reasoning is fallacious. As Mr. Justice Harlan made clear in his concurring opinion (*see* 393 U.S. at 239–245, 89 S.Ct. 414), *Oestereich* does not apply when factual and discretionary determinations are inherent in the classification or processing of the registrant who is seeking pre-induction review. And in Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424, 21 L.Ed.2d 418 (1968), decided the same day as *Oestereich*, the Court held that § 10(b) (3) precluded review of the reclassification of a registrant who claimed he was a conscientious objector, because the local board's action "inescapably involves a determination of fact and an exercise of judgment. By statute, classification as a conscientious objector is expressly conditioned on the registrant's claim being 'sustained by the local board.'" 393 U.S. at 258, 89 S.Ct. at 426.

■■ The question whether an exclusion order in this case would be beyond the authority of a special inquiry officer for the reason that no "entry" will occur upon plaintiff's return is, admittedly, one of law. Yet, unlike the issue involved in

inquiry officer. § 235(b), 8 U.S.C. § 1225(b) (1964).

Section 236(a), 8 U.S.C. § 1226(a) (1964), provides that the special inquiry officer shall hear and receive evidence, interrogate and examine the alien and witnesses. His determination shall be based solely on the evidence produced at this inquiry. His decision is final unless an appeal is timely prosecuted. § 236(c), 8 U.S.C. § 1226(c) (1964). 8

C.F.R. § 236.2 contains other procedural provisions relating to the method of conducting the hearing by the special inquiry officer.

11. Plaintiff submitted this argument with respect to § 106 of the 1952 Immigration Act, 8 U.S.C. § 1105a (1964). In view of the inapplicability of that section, the argument is academic.

*Oestereich* and similar to the one in Clark v. Gabriel, the resolution of this question depends on the particular facts of this case, which are disputed.

Moreover, as in Clark v. Gabriel, 393 U.S. 256, 89 S.Ct. 424 (1968), the statute which defines "entry", section 101(a) (13), 8 U.S.C. § 1101(a) (13) (1964),[12] explicitly requires that the determination of fact that a departure was not "voluntary" be made by the Attorney General. Thus, the type of exception exemplified in Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963) upon which plaintiff relies to bring his situation outside the term "entry", does not eliminate the necessity for a hearing before the special inquiry officer. The exclusion process, involving factors of discretion and fact-evaluation, is not one to which the *Oestereich* principle applies.

The circumstance that the statute requires the Attorney General (who has delegated his authority to various officials of the I.N.S., *see* 8 C.F.R. § 100.2) to make the initial factual and legal determination regarding "entry" lends further support to the Court's decision that consideration of the plaintiff's claims should be postponed until after the specialized agency has held a hearing and made the required report, findings, and orders. *Cf.* Far East Conference v. United States, supra.

Leedon v. Kyne, 35 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), does not dictate a contrary result. In that case, no factual considerations entered into the Court's determination that the National Labor Relations Board acted in excess of its statutory authority. Where factual questions are present and where the issue of an agency's jurisdiction depends on the effect of factual circumstances, Leedon v. Kyne, is inapplicable. Boire v. Greyhound Corporation, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958), presents wholly different considerations. Plaintiffs there had exhausted all their administrative remedies; and the Court held only that there was jurisdiction in the district court to review acts of the Secretary of the Army, which Congress said would be final.

*B. Should Plaintiff be Required to Exhaust his Administrative Remedies?*

■ Plaintiff contends that any proceedings before the I.N.S. would be futile, and consequently that he should not be required to follow the statutory procedure and exhaust his administrative remedies. He explains that—in view of the expiration of his immigration visa on May 20, 1968 after he had been absent from the United States for one year—he could be deemed excludable after a hearing before a special inquiry officer for failure to have the necessary entrance papers,—thus resulting in an administrative decision that does not reach the merits of whether he was excludable under 8 U.S.C. § 1182(a) (22) (barring aliens ineligible for citizenship or those who have departed the United States to avoid or evade military service).

Section 212(a) (20) of the 1952 Act, 8 U.S.C. § 1182(a) (20) (1964), does make excludable any alien who, at the time of his request for admission, is not in possession of a valid, unexpired immigrant

12. 8 U.S.C. § 1101(a)(13) provides:
"(13) The term 'entry' means any coming of an alien into the United States, from a foreign port or place from an outlying possession, whether voluntarily or otherwise, except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry into the United States for the purposes of the immigration laws if the alien proves to the satisfaction of the Attorney General that his departure to a foreign port or place or to an outlying possession was not intended or reasonably to be expected by him or his presence in a foreign port or place or in an outlying possession was not voluntary: *Provided,* That no person whose departure from the United States was occasioned by deportation proceedings, extradition, or other legal process shall be held to be entitled to such exception."

visa. Review from an order of exclusion rendered on this ground would be limited, as plaintiff suggests, to that particular ground and no other. Licea-Gomez v. Pilliod, 193 F.Supp. 577 (N.D.Ill. 1960). However, the Court can perceive no reason why plaintiff's primary argument—that his panic-induced flight was involuntary and that, consequently, he would not be making an "entry" upon his return—could not be presented to a reviewing court at that time. If no "entry" occurs when plaintiff shall have returned, the I.N.S. is without authority to exclude plaintiff even for lack of the appropriate entry documents.

Furthermore, even if plaintiff were making an "entry", he could apply to the district director of the port of entry for waiver of the requirement to present an unexpired, valid immigrant visa. If good cause exists for plaintiff's delay in seeking to return to the United States, *see* 8 C.F.R. § 211.1(b) (3) (1968), plaintiff could be granted this waiver; and he would then be able to have his substantive claim of right to admission (including his arguments that excluding him would violate his treaty right and constitutional rights) heard and determined, with judicial review available at the completion of the administrative process.

It is true that, should plaintiff be unable to satisfy the district director that there is good cause for his failure to have the proper papers, he would be relegated to applying to a consular official for a new visa with apparently no judicial review available from a refusal to issue a visa. 8 U.S.C. § 1104(a) (1964). But this circumstance would be one of plaintiff's own creation, resulting from his not having attempted more vigorously to return to this country for nearly one year. As a court of equity, this is an important element to be considered in deciding whether to grant or deny a preliminary injunction.

██ Because the doctrine of primary jurisdiction is clearly applicable, the Court concludes that plaintiff has not sustained his burden of proving a probability of success upon the merits of his claim for relief against the I.N.S. Accordingly, the Court hereby denies the motion for a preliminary injunction against defendant Esperdy.

The foregoing opinion contains the Court's findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52 (a).

So ordered.