**Andrew AKINS**

v.

**UNITED STATES.**

**C. D. 4629; Court No. 74-11-03228.**

United States Customs Court.

Jan. 26, 1976.

David C. Crosby, Thomas N. Tureen and Barry A. Margolin, Calais, Me., for plaintiff.

Rex E. Lee, Asst. Atty. Gen. (Velta A. Melnbrencis, trial atty.), New York City, for defendant.

OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

BOE, Chief Judge:

Plaintiff has moved for summary judgment under rule 8.2 of this court. Defendant, agreeing that no genuine issue of fact exists, has cross-moved for summary judgment in its favor.

From the pleadings and from the testimony submitted by affidavits, it appears that on July 16, 1974, plaintiff, a United States citizen, an Indian by race and a member of the Penobscot nation, entered the United States from Canada with hiking boots purchased in Canada for his own personal use. The merchandise in question was assessed at Calais, Maine border station with duty in the sum of $1.20 pursuant to item 700.45, Tariff Schedules of the United States, which provides:

SCHEDULE 7.—SPECIFIED PRODUCTS; MISCELLANEOUS AND NONENUMERATED PRODUCTS

PART 1.—FOOTWEAR; * * *

Subpart A.—Footwear

* * * * * * *

Footwear, of leather (except footwear with uppers of fibers):

* * * * * * *

Other:

* * * * * * *

For other persons:

* * * * * * *

Other:

* * * * * * *

| 700.45 | Valued over $2.50 per pair . . . . . . . . . . . . 10% ad val. |
|---|---|

The assessed duty was paid by the plaintiff and protest formally made in which an exemption from any duty was claimed pursuant to article III of the Treaty of Amity, Commerce and Navigation, 8 Stat. 116, 117 (1794) (hereinafter referred to as the Jay Treaty). The protest was denied and a summons timely

filed thus commencing the within civil action.

The defendant in its cross-motion denies the contention of the plaintiff and claims as its principal defense that article III of the Jay Treaty has been abrogated by the War of 1812.

I

Article III of the Jay Treaty provides:

It is agreed that it shall at all times be free to his Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America (the country within the limits of the Hudson's bay Company only excepted) and to navigate all the lakes, rivers and waters thereof, and freely to carry on trade and commerce with each other. But it is understood, that this article does not extend to the admission of vessels of the United States into the sea-ports, harbours, bays, or creeks of his Majesty's said territories; nor into such parts of the rivers in his Majesty's said territories as are between the mouth thereof, and the highest port of entry from the sea, except in small vessels trading bona fide between Montreal and Quebec, under such regulations as shall be established to prevent the possibility of any frauds in this respect. Nor to the admission of British vessels from the sea into the rivers of the United States, beyond the highest ports of entry for foreign vessels from the sea. The river Mississippi shall, however, according to the treaty of peace, be entirely open to both parties; and it is further agreed, that all the ports and places on its eastern side, to whichsoever of the parties belonging, may freely be resorted to and used by both parties, in as ample a manner as any of the Atlantic ports or places of the United States, or any of the ports or places of his Majesty in Great-Britain.

All goods and merchandize whose importation into his Majesty's said territories in America, shall not be entirely prohibited, may freely, for the purposes of commerce, be carried into the same manner aforesaid, by the citizens of the United States, and such goods and merchandize shall be subject to no higher or other duties, than would be payable to his Majesty's subjects on the importation of the same from Europe into the said territories. And in like manner, all goods and merchandize whose importation into the United States shall not be wholly prohibited, may freely, for the purposes of commerce, be carried into the same, in the manner aforesaid, by his Majesty's subjects, and such goods and merchandize shall be subject to no higher or other duties, than would be payable by the citizens of the United States on the importation of the same in American vessels into the Atlantic ports of the said states. And all goods not prohibited to be exported from the said territories respectively, may in like manner be carried out of the same by the two parties respectively, paying duty as aforesaid.

No duty of entry shall ever be levied by either party on peltries brought by land, or inland navigation into the said territories respectively, nor shall the Indians passing or repassing with their own proper goods and effects of whatever nature, pay for the same any impost or duty whatever. But goods in bales, or other large packages, unusual among Indians, shall not be considered as goods belonging bona fide to Indians.[1]

1. It is further provided under article XXVIII of the Jay Treaty that article III is permanent in nature. In 1796, the United States and Great Britain further agreed to the explanatory article on May 4, 1796, 8 Stat. 130, which provided in part:

That no stipulations in any treaty subsequently concluded by either of the contracting parties with any other state or nation, or with any Indian tribe, can be understood to derogate in any manner from the rights of free intercourse and commerce, secured by the aforesaid third

There has been a lack of uniformity with respect to the effect of war upon a treaty existing between belligerent countries. Authorities on international law have expressed divergent opinions. Although in early years the doctrine generally prevailed that war, ipso facto, abrogated all treaties uniformly, it has become more universally accepted that the abrogation of a treaty provision is dependent upon its intrinsic nature and character.

In the early history of this country, the Supreme Court in the case of *Society for the Propagation of the Gospel v. New Haven,* 21 U.S. (8 Wheat.) 206, 219, 5 L.Ed. 662 (1823), adhering to a more flexible construction with respect to the doctrine relating to treaty abrogation, therein stated:

But we are not inclined to admit the doctrine urged at the bar, that treaties become extinguished, *ipso facto,* by war between the two governments, unless they should be revived by an express or implied renewal on the return of peace. Whatever may be the latitude of doctrine laid down by elementary writers on the law of nations, dealing in general terms, in relation to this subject, we are satisfied, that the doctrine contended for is not universally true. There may be treaties of such a nature, as to their object and import, as that war will put an end to them; but where treaties contemplate a permanent arrangement of territorial, and other national rights, or which, in their terms, are meant to provide for the event of an intervening war, it would be against every principle of just interpretation to hold them extinguished by the event of war. If such were the law, even the treaty of 1783, so far as it fixed our limits, and ac-

knowledged our independence, would be gone, and we should have had again to struggle for both upon original revolutionary principles. Such a construction was never asserted, and would be so monstrous as to supersede all reasoning. We think, therefore, that treaties stipulating for permanent rights, and general arrangements, and professing to aim at perpetuity, and to deal with the case of war as well as peace, do not cease on the occurrence of war, but are, at most, only suspended while it lasts; and unless they are waived by the parties, or new and repugnant stipulations are made, they revive in their operation at the return of peace.

The decision in the foregoing case affirmed the right of a British corporation to continue to own and hold lands in the state of Vermont by virtue of the protective provisions of article VI of the treaty of 1783, 8 Stat. 80, 83, and confirmed by article IX of the Jay Treaty. Inasmuch as the provisions of the respective treaties were construed as relating to and affecting vested property rights to be owned and transferred in perpetuity, the provisions thereof were held not to be abrogated by the War of 1812.

The decision of the Supreme Court in *Society for the Propagation of the Gospel v. New Haven, supra,* relating as aforesaid to the survival of vested property rights confirmed by article IX of the Jay Treaty, was applied in the case of *McCandless v. United States ex rel. Diabo,* 25 F.2d 71 (3d Cir. 1928), to the right granted by article III of the Jay Treaty to the subjects of Great Britain, United States citizens and all Indians to "pass" and "repass" the boundary between Canada and the United States. The court of appeals therein found that an Indian, born on a reservation in Can-

article of the treaty of amity, commerce and navigation, to the subjects of his Majesty and to the citizens of the United States, and to the Indians dwelling on either side of the boundary line aforesaid; but that all the said persons shall remain at full liberty freely to pass and repass by land or inland navigation, into the

respective territories and countries of the contracting parties, on either side of the said boundary line, and freely to carry on trade and commerce with each other, according to the stipulations of the said third article of the treaty of amity, commerce and navigation.

\*   \*   \*   \*   \*   \*

ada, who made a number of trips from Canada to the United States in the course of his employment was not in violation of existing immigration laws. In so doing, the court concluded that the provision of article III granting the right to "pass" and "repass" was a permanent and vested right which at the most was only suspended and not abrogated by the War of 1812.

By way of historical background, the court pointed out that the boundary line between Canada and the United States—defined by the Jay Treaty—passed through lands held and occupied by a confederation of Indian tribes or nations.[2]

Throughout the Revolutionary War as well as the War of 1812, the confederacy as a whole remained neutral leaving to the individual tribe the discretion to side with either belligerent. It would appear that the apparent neutrality of the Indian confederacy as a whole during the respective periods of hostility between the United States and Great Britain influenced the court of appeals in its conclusion that " * * * there was no reason why either of the contending nations in 1812 should desire to change the status of the Six Nations and thereby anger and drive them into hostilities." 25 F.2d at 72. See also *Akins v. Saxbe,* 380 F.Supp. 1210, 1212–13 (N.D.Me.1974).

Plaintiff has urged that the *McCandless* decision is controlling of the issue involved in the case at bar, notwithstanding the subsequent decision of the United States Supreme Court in the case of *Karnuth v. United States ex rel. Albro,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677 (1929). In the *Karnuth* case, two Canadian residents in support of their entry into the United States free from existing immigration restrictions invoked specifically the first paragraph of article III of the Jay Treaty granting: "To His Majesty's subjects, and to the citizens of the United States, and also to the Indians dwelling on either side of the said

boundary line, freely to pass and repass by land or inland navigation, into the respective territories and countries of the two parties, on the continent of America * * *."

The court citing with approval the decision in the case of *Society for the Propagation of the Gospel v. New Haven, supra,* further defined the distinction between treaty provisions creating vested property rights and those rights and privileges promissory and prospective in character. In so doing, the court stated (279 U.S. at 239–42, 49 S.Ct. at 277):

> These cases are cited by respondents and relied upon as determinative of the effect of the War of 1812 upon Article III of the treaty. This view we are unable to accept. Article IX and Article III relate to fundamentally different things. Article IX aims at perpetuity and deals with existing rights, vested and permanent in character, in respect of which, by express provision, neither the owners nor their heirs or assigns are to be regarded as aliens. These are rights which, by their very nature, are fixed and continuing, regardless of war or peace. But the privilege accorded by Article III is one created by the treaty, having no obligatory existence apart from that instrument, dictated by considerations of mutual trust and confidence, and resting upon the presumption that the privilege will not be exercised to unneighborly ends. It is, in no sense, a vested right. It is not permanent in its nature. It is wholly promissory and prospective and necessarily ceases to operate in a state of war, since the passing and repassing of citizens or subjects of one sovereignty into the territory of another is inconsistent with a condition of hostility. See 7 Moore's Digest of International Law, § 1135; 2 Hyde, International Law, § 606. The reasons for the conclusion are obvious—among them, that other-

---

2. The Penobscot tribe of which the plaintiff is a member was one of the nations comprising this confederacy.

wise the door would be open for treasonable intercourse. And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war. Disturbance of peaceful relations between countries occasioned by war, is often so profound that the accompanying bitterness, distrust and hate indefinitely survive the coming of peace. The causes, conduct or result of the war may be such as to render a revival of the privilege inconsistent with a new or altered state of affairs. The grant of the privilege connotes the existence of normal peaceful relations. When these are broken by war, it is wholly problematic whether the ensuing peace will be of such character as to justify the neighborly freedom of intercourse which prevailed before the rupture. It follows that the provision belongs to the class of treaties which does not survive war between the high contracting parties * * *.

\* \* \* \* \* \*

These expressions and others of similar import which might be added, confirm our conclusion that the provision of the Jay Treaty now under consideration was brought to an end by the War of 1812, leaving the contracting powers discharged from all obligation in respect thereto, and, in the absence of a renewal, free to deal with the matter as their views of national policy, respectively, might from time to time dictate.

We are not unmindful of the agreement in Article XXVIII of the Treaty "that the first ten articles of this treaty shall be permanent, and that the subsequent articles, except the twelfth, shall be limited in their duration to twelve years." It is quite apparent that the word "permanent" as applied to the first ten articles was used to differentiate them from the subsequent articles—that is to say, it was not employed as a synonym for "perpetual" or "everlasting," but in the sense that those articles were not limited to a specific period of time, as was the case in respect of the remaining articles. Having regard to the context, such an interpretation of the word "permanent" is neither strained nor unusual. See *Texas, etc., Railway Co. v. Marshall*, 136 U.S. 393, 403, 10 S.Ct. 846, 34 L.Ed. 385; *Bassett v. Johnson*, 2 N.J.Eq. 154, 162.

Because of the possibility of treasonable intercourse that might occur during hostilities as a result of unrestricted passage and because such right of free passage might "be incompatible with conditions following the termination of war," the court determined that the provisions of article III relating to "passing" and "repassing" could not be deemed vested property rights but rather promissory and prospective in character and, accordingly, abrogated by the War of 1812.

It is deserving of note that in the cases of *McCandless v. United States* and *Karnuth v. United States*, previously referred to, the issue in question was restricted to the provisions of the first paragraph of article III relating solely to the free "passing" and "repassing" of persons across the boundary between the United States and Canada. However, in the case of *United States v. Garrow*, 88 F.2d 318, 24 CCPA 410 (1937), *cert. denied*, 302 U.S. 695, 58 S.Ct. 14, 82 L.Ed. 537 (1937), the Court of Customs and Patent Appeals considered the issue closely akin to that existing in the case at bar. In the *Garrow* case an Indian, residing in Canada, entered the United States bringing with her certain baskets. Protesting the imposition of a duty on the baskets pursuant to paragraph 411 of section 1 of the Tariff Act of 1930, the plaintiff claimed an exemption therefrom pursuant to the provisions of article III of the Jay Treaty. The court, following the reasoning of the United States Supreme Court in the *Karnuth* decision, held that the provisions of article III of the Jay Treaty had been abrogated by the War of 1812, and, accordingly, the protestant was subject to the

duty exacted on the merchandise carried with her.[3]

In its decision, the court stated (88 F.2d 318, 24 CCPA at 418):

The view of the Supreme Court on this interesting question, expressed in the case last cited, was confirmatory of views held by that court from the initiation of our Government. See *Society for the Propagation of the Gospel in Foreign Parts v. Town of New Haven and William Wheeler*, 8 Wheat. 464, 494, 5 L.Ed. 662.

It was also obviously in conformity with the current of authority both in the United States and England. Moore's International Law Digest, Vol. 5, paragraph 779.

The plaintiff, however, urges that the reliance of the court in the *Garrow* decision upon the *Karnuth* case was misplaced in that the provision of article III of the Jay Treaty relating to the exemption of Indians from duty when carrying their personal belongings and effects is separable from that portion of the article relating to the free passage of the United States citizens, British subjects and Indians. This court recognizes that the abrogation of one provision of a treaty necessarily does not strike down the entire treaty nor other independent provisions thereof which should properly survive. *Techt v. Hughes*, 229 N.Y. 222, 128 N.E. 185 (1920), *cert. denied*, 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920). However, viewing the respective provisions of article III independently as well as in their entirety, it would appear that a consistent logical construction thereof would preclude the application of the doctrine of separability to the provisions of the treaty here under consideration.

The rationale of the *Karnuth* decision is predicated upon the premise that the possibility of treasonable intercourse in the time of war justifies the abrogation of that portion of article III relating to

free "passing" and "repassing" of the person. The *Garrow* decision has extended that reasoning to apply to that portion of article III relating to the exemption from duty upon "personal belongings and effects" of Indians when "passing" or "repassing" the boundary between the United States and Canada. The possibility of treasonable intercourse occurs as the result of the physical movement of the individual. It would be incredulous to assume that the act of carrying "personal goods and effects" while "passing" or "repassing" would cause the possibility of treasonable intercourse to be less likely. The carrying of "personal belongings and effects," and the exemption of duty thereon, as referred to in article III of the Jay Treaty, is dependent on the physical passage of the individual. If, therefore, the right of physical passage is abrogated by war, it logically follows that the right and privilege relating to the carrying of "personal goods and effects" and the exemption from duty thereon, which are an integral part of the physical movement, are likewise abrogated.

Nor can this court accept the argument urged by the plaintiff that the historical friendship between the Penobscot tribe and the United States would make the possibility of treasonable intercourse unlikely, thereby removing the reason for the abrogation of article III. Neither the Jay Treaty nor the *Karnuth* nor *Garrow* decisions contemplate any distinction between Indians who may have been friendly or unfriendly to the American colonies or the American government. Nor has the distinction been made between Indians residing within the territorial boundaries of Canada or of the United States.

Throughout the entire provisions of article III and in each of the foregoing decisions, reference has been made to United States citizens, to subjects of

---

**3.** In the *Garrow* case, the court pointed out that an appeal did not result in the *McCandless* case possibly because of the "fact that on April 2, 1928, an act of Congress was approved which provided that the Immigration Act of 1924 should not apply to Indians crossing the international border (45 Stat. 401)." 88 F.2d 318, 24 CCPA at 416.

Great Britain and to Indians as respective classes. To differentiate between persons, groups or tribes in each of said classes who may have been friendly or unfriendly would require the adoption of a subjective test and standard as to the possibility of treasonable intercourse which would be impossible of determination.

This court is likewise unwilling to accept the observation of the court of appeals in the *McCandless* case that Indians, not signatories to the treaty but third party beneficiaries thereunder, should be afforded greater rights than the signatories themselves. The contracting parties in executing the Jay Treaty were the United States and Great Britain. The citizens and subjects of each country including the Indians residing within their respective territories continued to enjoy such rights and privileges provided by article III thereof only as long as the agreement itself remained binding between the original contracting parties. No issue is taken with the several decisions cited by the plaintiff in which it has been repeatedly held that the promises and obligations of the United States government to the Indian resident within its boundaries must be upheld and that the abrogation of such promises cannot be lightly implied. *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *United States v. Payne*, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924); *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). However, an examination of the authorities in question will reveal that the statement so often enunciated by the courts has been applicable to those cases involving treaties made by the United States government directly with the Indian tribe or tribes. No parallel can be drawn therefrom with the applicable provisions of article III of the Jay Treaty under consideration herein.

In this connection it is of interest to note the construction placed by the courts of Canada on the question here in issue. In the case of *Francis v. The Queen*, 4 Dominion Law Reports 760 (1955), a petition was filed in the Exchequer Court of Canada by a Canadian Indian seeking an exemption under the provisions of article III of the Jay Treaty from a duty imposed on personal goods brought by him from the United States. The court, holding that the provisions of article III had been abrogated by the War of 1812, cited with approval the decisions of *Karnuth v. United States, supra,* and *United States v. Garrow, supra,* stating (4 D.L.R. at 776):

> * * * while it is true that these cases are not binding upon me, the reasons given in each case commend themselves to me and with respect I shall adopt them in this case. * * *[4]

The plaintiff in his presentation of all issues that might serve to preserve the continued viability of article III of the Jay Treaty has urged that the provisions thereof, at the most, only were suspended during the War of 1812. Contending that the exemption of the personal goods and effects of Indians from duty is a commercial provision, attention has been directed to *The Sophie Rickmers*, 45 F.2d 413 (2 Cir. 1930). A careful examination of this case, however, would not lead to the conclusion offered by the plaintiff. In the aforecited case a German ship entering the port of New York was subjected to a tonnage duty pursuant to existing statutes. Plaintiff's contention that the ship was exempt from duty by virtue of the Hanseatic Convention of 1827 and the Prussian Treaty of 1828 presented the issue as to whether the said treaties were abrogated by World War I. In its decision the court recognized that treaties which are commercial in character may be considered either suspended or abrogated at the option of the belligerents. Accordingly, in view of

---

**4.** On appeal the Supreme of Canada, 3 D.L.R.(2d) 641 (1956), although affirming the trial court, predicated its decision on the premise that the Canadian law required such rights and privileges as provided in article III of the Jay Treaty to be first implemented and sanctioned by legislation. Such implementation had not been enacted.

the intention of the contracting parties determined from the surrounding controlling circumstances, the treaties therein question were held to have been only suspended by World War I and in full force and effect after the termination of hostility. In its determination, the court clearly distinguishing the decision of the Supreme Court in the case of *Karnuth v. United States, supra,* stated (45 F.2d 421):

The holding in *Karnuth v. United States,* 279 U.S. 231, 49 S.Ct. 274, 73 L.Ed. 677, does not, in my judgment, cover the present facts. In that case, it was decided that article 3 of the Jay Treaty of 1783, providing for free passage of American and British nationals across the Canadian border, had been annulled and not merely suspended by the War of 1812. The theory of the decision clearly distinguished it from the case at bar. The free passage of persons, as was said by the court, " * * * is inconsistent with a condition of hostility. * * * The reasons for the conclusion are obvious—among them, that otherwise the door would be open for treasonable intercourse. And it is easy to see that such freedom of intercourse also may be incompatible with conditions following the termination of the war." 279 U.S. 239, 49 S.Ct. 274, 277, 73 L.Ed. 677.

It can readily be understood that the mere occurrence of war should have that necessary effect on rights of free passage and repassage. Before the war, each state may have felt secure in the expectation of a lasting peace. The incidence of war destroys that expectation; what has happened once may happen again. It is therefore necessary to reconsider the wisdom of allowing free passage over our unprotected borders and, in the meantime, not to recognize a treaty right thereto. The present case presents no such problem. If the question involved were the complete exclusion of German vessels, the analogy might be a fair one. The issue here is different.

The right of entry is not denied; the only question presented is the treaty limitation on the power to tax. Taxation or no taxation cannot vitally affect the course of trade, for the taxes imposed are not so large as to be prohibitory. It is difficult to see how reciprocity of tonnage taxation can in any way affect the national safety, the right of entry itself being in no way denied. * * *

In the *Rickmers* case, the sole issue under consideration involved the continued validity of the treaty restrictions to assess a tonnage tax. Neither the exclusion of the vessel was in issue nor, in fact, was the right of entry denied. In the instant case, on the other hand, the duty exemption provided for in the third paragraph of article III related to the "personal goods and effects" of Indians carried when "passing" or "repassing" the boundary. The application of the duty exemption only to the "personal goods and effects" of the Indians when "passing" and "repassing" as distinguished from "goods in bales, or other large packages" serves to emphasize the intent that such a right and privilege was not commercial but personal in character and interwoven with the actual physical passage of the Indians—a right separately and individually granted under the provisions of paragraph 1 of article III. If the right of "passing" and "repassing" of persons lends itself to the possibility of treasonable intercourse, as held in the *Karnuth* case, the joinder therewith of a duty exemption on "personal goods and effects" when so "passing" or "repassing," indeed, cannot be said to remove that possibility.

This court, accordingly, concludes that the decisions in *Karnuth v. United States, supra,* and *United States v. Garrow, supra,* are properly determinative of the facts and issues in the instant action and that the applicable provisions of article III of the Jay Treaty, relied on by the plaintiff herein, have been abrogated by the War of 1812.

## II

Although the foregoing determination would preclude the necessity to consider further issues in connection with its decision, the court is desirous of addressing itself to an additional question presented briefly by the defendant in the case at bar. I refer to the relationship existing between a treaty of the United States and a subsequent expression of Congress evidencing an inconsistent provision.

Article VI of the Constitution of the United States provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the land * * *.

It has been repeatedly held that the foregoing constitutional provision in designating a treaty and a congressional act as the supreme law of the land places both in parity with each other. *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Whitney v. Robertson*, 124 U.S. 190, 88 S.Ct. 456, 31 L.Ed. 386 (1888).

However, when each instrument relates to a common subject matter and at the same time contains inconsistent provisions, some standard must be adopted to determine which shall prevail. In construing such conflicting instruments every reasonable effort will be made by the courts to interpret them in a manner so as to give effect to both. *Whitney v. Robertson, supra; Cook v. United States*, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933).

In the case of a nonself-executing treaty, little difficulty is encountered where it appears that the treaty instrument may be in conflict with statutory provisions. Inasmuch as it is the function and obligation of the Congress to implement the nonself-executing treaty by appropriate legislation, it follows that the Congress thereafter may amend, modify and even rescind its former implementing legislation.

Thus, it is only with respect to the relationship between self-executing treaties and conflicting congressional acts that a resolution as to their respective applicability must be made. The distinction between nonself-executing and self-executing treaties and their respective relationship with subsequent acts of Congress has been clearly stated in the case of *Whitney v. Robertson, supra* 124 U.S. at 194, 8 S.Ct. at 458.

* * * A treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law. For the infraction of its provisions a remedy must be sought by the injured party through reclamations upon the other. When the stipulations are not self-executing, they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions, so far as they bind the United States, or supersede them altogether. By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but, if the two are inconsistent, the one last in date will control the other: provided, always, the stipulation of the treaty on the subject is self-executing. If the country with which the treaty is made is dissatisfied with the action of the legislative department, it may present its complaint to the executive head of the government, and take such other

measures as it may deem essential for the protection of its interests. The courts can afford no redress. * * *

Again, in the case of *Reid v. Covert, supra,* 354 U.S. at 18, 77 S.Ct. at 1231, Mr. Justice Black, speaking for the Court, stated:

This Court has also repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null. It would be completely anomalous to say that a treaty need not comply with the Constitution when such an agreement can be overridden by a statute that must conform to that instrument.

An exhaustive consideration of this question was made by the Supreme Court of the United States in the case of *Chae Chan Ping v. United States,* 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). In the foregoing case, commonly known as *"The Chinese Exclusion Case,"* challenge was made to the congressional act of 1888 " * * * as being in effect an expulsion from the country of Chinese laborers in violation of existing treaties between the United States and the government of China, and of rights vested in them under the laws of Congress" (130 U.S. at 599–600, 9 S.Ct. at 627). The Court (130 U.S. at 600, 9 S.Ct. at 627), in upholding the validity of the act in question stated:

* * * The treaties were of no greater legal obligation than the act of Congress. By the Constitution, laws made in pursuance thereof and treaties made under the authority of the United States are both declared to be the supreme law of the land, and no paramount authority is given to one over the other. A treaty, it is true, is in its nature a contract between nations, and is often merely promissory in its character, requiring legislation to carry its stipulations into effect. Such legislation will be open to future repeal or amendment. If the treaty operates by its own force, and relates to a subject within the power of Congress, it can be deemed in that particular only the equivalent of a legislative act, to be repealed or modified at the pleasure of Congress. In either case the last expression of the sovereign will must control.

Recognizing that national interest may demand that the Congress exercise the authority imposed upon it by the Constitution, notwithstanding that such an act might contravene prior treaty commitments, the Court (130 U.S. at 600–601, 9 S.Ct. at 628), continued:

* * * It will not be presumed that the legislative department of the government will lightly pass laws which are in conflict with the treaties of the country; but that circumstances may arise which would not only justify the government in disregarding their stipulations, but demand in the interests of the country that it should do so, there can be no question. Unexpected events may call for a change in the policy of the country. * * *

The Court in the *Chinese Exclusion Case* clearly differentiated between rights and interests created by a treaty which may have become vested and rights which are personal in character and pertain to privileges to be exercised only by the individual in the future. The Court (130 U.S. at 601–602, 9 S.Ct. at 628), further stated:

This act, as seen, applied in terms only to the future. Of course, whatever of a permanent character had been executed or vested under the treaties was not affected by it. In that respect the abrogation of the obligations of a treaty operates, like the repeal of a law, only upon the future, leaving transactions executed under it to stand unaffected. The validity of this legislative release from the stipulations of the treaties was, of course not a matter for judicial cognizance. The question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts. * * *

The Court (130 U.S. at 609, 9 S.Ct. at 631), continued:

* * * The rights and interests created by a treaty, which have become so vested that its expiration or abrogation will not destroy or impair them, are such as are connected with and lie in property, capable of sale and transfer or other disposition, not such as are personal and untransferable in their character. * * *

In light of the foregoing, it is proper to examine the successive statutes relating to the same rights and privileges provided for in article III of the Jay Treaty enacted by the Congress pursuant to the powers vested in it by article I, section 8 of the Constitution providing:

The Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, * * *

To regulate commerce with foreign nations, and among the several States, and with the Indian tribes; * * *

In 1799 the Congress enacted legislation, the provisions of which closely pattern the language contained in article III of the Jay Treaty, section 105 thereof providing:

*And be it further enacted,* That no duty shall be levied or collected on the importation of peltries brought into the territories of the United States, nor on the proper goods and effects of whatever nature, of Indians passing, or repassing the boundary line aforesaid, unless the same be goods in bales or other large packages unusual among Indians, which shall not be considered as goods belonging bona fide to Indians, nor be entitled to the exemption from duty aforesaid. * * * [1 Stat. 627, 702.]

Inasmuch as the provisions of article III of the Jay Treaty were self-executing, the statutory provisions aforequoted were not enacted for the purpose of implementing the treaty but, as stated in section 104 of the act, to conform the statutes of the United States to the treaty provisions.

From time to time thereafter Congress enacted repeated legislative acts providing for the same duty exemption as contained in section 105 of the statute aforequoted. The 43d Congress of 1873–1874 enacted section 2515 as a part of the Statutes at Large entitled Revised Statutes of the United States. This section incorporated the identical language found in section 105 of the act of 1799. In a revision of 1878, section 2515 was again repealed. In the Tariff Act of March 3, 1883, 22 Stat. 488, 523, section 2512 was enacted which again incorporated substantially the same language as contained in previous statutory sections.

It was not until the enactment of the Tariff Act of 1890, 26 Stat. 567, 608, that a substantial change in language appears. In paragraph 674 of section 2 thereof, the prior statute was amended to provide:

Peltries and other usual goods and effects of Indians passing or repassing the boundary line of the United States, under such regulations as the Secretary of the Treasury may prescribe: *Provided,* That this exemption shall not apply to goods in bales or other packages unusual among Indians.

In the tariff revision of 1894, 28 Stat. 509, 543, paragraph 582 was enacted reincorporating the identical language contained in the Tariff Act of 1890, aforequoted.

It will be noted that the provisions of the Tariff Act of 1890 and their reincorporation in the tariff revision of 1894 changed significantly the provisions of the original congressional act of 1799. Instead of permitting the duty-free entry of *all* peltries brought into the territories of the United States, the latter provision restricted the exemption only to "peltries and other usual goods and effects" of Indians, subject to such regulations as the Secretary of the Treasury may prescribe.

In the tariff act enacted by the Congress in 1897, 30 Stat. 151, 213, section 34 thereof repealed, *inter alia,* paragraph

582 of the Tariff Act of 1894 and all other acts inconsistent therewith.

Since the year 1897, neither the statutes nor the tariff schedules of the United States have provided an exemption from the payment of duty by Indians "passing" or "repassing" across the boundary between the United States and Canada with their personal belongings or their own proper goods. On the contrary, articles of personal property such as hunting boots, the merchandise which is the subject of the instant action, is the subject of duty (item 700.45, TSUS).[5]

As this court has hereinbefore indicated, the right granted by article III of the Jay Treaty as well as by subsequent congressional acts cannot be construed other than as a privilege personal and nontransferable in character. The abrogation or recision of this right in no manner affected the interest of those persons who heretofore had exercised this privilege. In short, the duty-free privilege granted by the Jay Treaty as well as by statute did not confer upon the beneficiaries a vested interest of such a permanent character that a recision thereof constituted an abrogation of an executed proprietory right.

The self-executing provisions of article III of the Jay Treaty being only promissory in character, the question presented is the effect of subsequent "expressions" of the Congress upon the specific duty-free privileges granted thereunder.

Had the Congress by legislation expressly and directly repealed the duty-free privilege provided in article III of the Jay Treaty, no doubt would exist that such a statute, enacted subsequent in time to the treaty and constituting the " * * * last expression of the sovereign * * *," would control and render the treaty provisions a nullity, *Reid v. Covert, supra; Chae Chan Ping v. United States, supra.* However, as previously referred to herein, commencing in 1799, the Congress in the exercise of the exclusive power delegated to it by the Constitution expressed its policy with respect to the exaction of duty from Indians who "passed" and "repassed" the boundary between the United States and Canada carrying with them peltries and their personal belongings. Notwithstanding that the original as well as the several subsequent statutes enacted by the Congress contained similar language to that provided in article III of the Jay Treaty and were in conformity therewith, said statutes constituted and continued to constitute an independent declaration of legislative policy and intent. The subsequent amendments provided for in the Tariff Acts of 1890 and 1894, the express repeal of all prior acts relating to the duty exemption in question provided in the Tariff Act of 1897 and the enforcement of duty provisions thereafter by administrative officials lend validity to the interpretation that the Congress, pursuant to its constitutional duty and obligation, deemed that the passage of 100 years required a change in the tariff policy of this country. The specific inclusion of personal goods and belongings in subsequent tariff acts and tariff schedules of the United States likewise serves to corroborate the congressional intent to nullify the personal privilege which originally had been granted by article III of the Jay Treaty.

This court does not agree with the admonition of plaintiff's counsel that a concurrence in the reasoning of some of the appellate court decisions referred to herein would constitute a "perpetuation of an historical injustice." Nor can this court accept the premise, sometimes offered in order to reach a desired result, that the reasoning of earlier appellate decisions may have been eroded and become archaic through the passage of time.

Many wrongs may have been committed against the Indian people. The expi-

---

**5.** Although personal exemptions exist under the present Tariff Schedules of the United States, no evidence has been submitted to the court that the particular merchandise herein would fall within those provisions.

ation of past injustices to a minority group of our citizens, however, cannot be accomplished by a present refusal to adhere to the decisions of our appellate courts, which, independent of the rule of stare decisis, are deemed well reasoned and sound.

Indeed, the obligation of any strong and independent judiciary must be to zealously guard and protect the rights of minorities. But in so doing, reasoned objectivity in the exercise of judicial determination cannot be sacrificed.

It is the opinion of this court that the provisions of article III of the Jay Treaty of 1794 have been abrogated and are no longer in force and effect, nor constitute "the supreme law of the land" as they may relate to the plaintiff and the issues raised by him in his motion for summary judgment. Accordingly, the cross-motion of the defendant for summary judgment be and is hereby granted and the motion of the plaintiff for summary judgment is in all things denied.

Let judgment be entered accordingly.